**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| **LAURIE BILSBARROW,** ) | |
| ) | |
| Plaintiff, ) | Case No. EDCV 07-00569 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural history of this case, which is summarized in the Joint Stipulation. [See JS 2]. Plaintiff is a "36-year-old woman with a limited education" who alleges onset of disability on December 1, 1995 due to depression, paranoia, bulimia, and agoraphobia. [JS 2]. In a December 2006 written hearing decision that constitutes the final decision of the Commissioner, an administrative law judge (the "ALJ") found that plaintiff retained the residual functional capacity ("RFC") to perform work available in significant numbers in the national economy.[See JS 2; Administrative Record

("AR") 11-17].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Discussion

**Global Assessment of Functioning scores**

Plaintiff contends that the ALJ erroneously ignored the following Global Assessment of Functioning ("GAF") scores documented in the record: 30 in July 1996 [AR 257], 40 in October 2001 [133], 35 in January 2002 [AR 178], 55 in May 2002 [AR 153], and 45 in February 2005 [AR 110].

The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological symptoms, or the patient's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") Multiaxial Assessment 30 (4th ed. 1994)(revised 2002). An individual's symptom severity may not correlate with the individual's degree of functional impairment. If those two components are "discordant," the GAF rating reflects "the worse of the two." DSM-IV at 32. A GAF score of 30 means that a serious impairment in communication or judgment exists, or the individual is unable to function in almost all areas. A GAF score between 31 and 40 signifies some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF score of 41 through 50 denotes serious

symptoms or a serious impairment in social, occupational, or school functioning.  A score of 51 through 60 signifies moderate symptoms or moderate difficulty in social, occupational, or school functioning.  See DSM-IV at 34.

The ALJ did not disregard plaintiff's GAF scores, as plaintiff suggests.  He noted that plaintiff was given a current GAF score of 20 in February 2001, when police deemed her a danger to herself and brought her to the Riverside County Regional Medical Center (the "County Medical Center") for emergency admission pursuant to California Welfare and Institutions Code section 5150. [AR 14, 366-369]. The treatment reports note that plaintiff was intoxicated and had been involved in a physical altercation with her father while she was under the influence. [AR 367]. Her "chief complaint" was recorded as "I need to get on disability." [AR 367].  She had been seen about a month earlier at the County Medical Center and had received a diagnosis of depressive disorder not otherwise specified.  She was prescribed thorazine and said she was compliant with her medication.[1] She reported that she was unemployed, lived with her parents, was going through a divorce, and had lost custody of her two children, but she could not explain why.  The physician suspected that plaintiff was "hiding her history" but did not yet have access to plaintiff's medical records.  The physician observed that plaintiff was "focused on getting disability because she does not feel she can work and no longer wants to live with her family.  She accuses her father of lying to the police even though I quoted the patient from the 5150. She reports no acute medical problems or symptoms. Outside of the thorazine, she is not taking any medication. . . ." [AR 368].

On mental status examination, plaintiff was "clearly angry" but denied suicidal or violent thoughts. Her impulse control was impaired, and her insight and judgment were poor, but she did not exhibit psychotic symptoms.  Diagnoses were "alcohol intoxication and rule out alcohol abuse." Her highest past year GAF was estimated at 60, signifying no more than moderate symptoms or a moderate functional impairment. [AR

---

[1] Treatment reports in the record indicate that police had brought plaintiff to a County mental health treatment facility under section 5150 as a danger to herself and others a couple of weeks earlier, on January 30, 2001. [AR 379-386].  A past diagnosis of bipolar disorder was noted, but plaintiff's mother said that plaintiff had not been on medication since the early 1990s. Plaintiff was given diagnoses of depression NOS, psychosis NOS, marijuana abuse, rule out alcohol abuse, rule out borderline personality disorder. She also was assigned a GAF score of 31. [AR 379]. Plaintiff was prescribed thorazine "for now." [AR 380].  Plaintiff rejected substance abuse services offered to her. [AR 383].

3

1  14, 367-368].

2  The ALJ also summarized a February 2005 consultative psychiatric examination report. [AR 14, 410-413]. The examining physician, Dr. Marquez, diagnosed mood disorder NOS, rule out bipolar disorder, rule out substance induced mood disorder, polysubstance abuse. [AR 413]. She gave plaintiff a current GAF score of 55, signifying moderate symptoms or a moderate degree of functional impairment. [AR 413]. Dr. Marquez opined that plaintiff had mild limitations in her ability to understand, remember and carry out simple and complex instructions and moderate limitations in her ability to interact with the public, supervisors, and co-workers as well as in her ability to withstand the stress and pressures associated with an 8-hour work day. [AR 413].

The ALJ further noted that on August 13, 2005, about six months after plaintiff's prior emergency treatment admission, plaintiff again was admitted to the County Medical Center on a section 5150 hold as a danger to others after she attempted to break into her parents' home. [AR 14, 454-465]. She admitted using marijuana, crack and alcohol and smelled strongly of alcohol. Her drug screen was positive for marijuana and methamphetamine. [AR 458]. On initial assessment, plaintiff was paranoid, agitated and disoriented. She was admitted and placed on medication. Her irritability improved significantly. She did not exhibit any dangerous behavior and denied hallucinations. [AR 15, 457-459].

Plaintiff requested discharge on August 16, 2005. Her mental status examination was unremarkable except that her insight and judgment were only "fair." She was discharged to her own care. Her discharge diagnoses were bipolar disorder NOS and methamphetamine abuse. Her GAF was 40 on admission and 60 on discharge. She was encouraged to be compliant with her prescribed medication for bipolar disorder, to refrain from drug use, and to pursue rehabilitation. Her prognosis was guarded due to continuing "morbid substance use." [AR 458-459].

In his decision, the ALJ stated

> the medical evidence indicates that the claimant had been using alcohol and drugs; thus, the claimant had a low GAF's [sic] on her records. Also, the medical evidence indicates that the claimant was not compliant with her medications.
>
> The Administrative Law Judge has considered the evidence as a whole, including low GAFs [sic] 40 and 55. However, these GAFs were based on the claimant's use of drugs and

4

>alcohol on admission on more than several occasions. In the absence of objective findings, the functional assessments would appear to be predicated on the claimant's subjective allegations as to her functional limitations which as discussed herein, [sic] are not persuasive. The nature of the claimant's treatment, which has been conservative under these reports, is also inconsistent with the degree of limitations as reported. An overview of the record shows no significant changes in the claimant's medical status as to warrant the more restrictive mental limitations. The [ALJ] notes that the claimant's alcohol and drug use affected her mental limitations. Also, as discussed before, the claimant has not been compliant with her medications.

[AR 15]. Although the quoted paragraphs do not explicitly reference plaintiff's GAF scores under 40, that omission is not legal error and does not deprive the ALJ's decision of substantial support in the record.

First, although the ALJ did not mention plaintiff's GAF scores below 40 in the quoted paragraphs, he already had acknowledged in his summary of the medical evidence that plaintiff had been given a GAF score as low as 20. [AR 14].

Second, the reasons given by the ALJ in the quoted paragraphs for discounting plaintiff's low GAF scores are equally applicable to plaintiff's GAF scores that were less than 40. Her low GAF scores were assigned during intermittent episodes of crisis over a period of almost ten years (1996 through 2005) when the medical evidence and plaintiff's own statements convincingly demonstrate that she was actively, chronically abusing street drugs and alcohol. At times she actually was intoxicated when her condition was assessed. In addition, plaintiff had a well-documented pattern of refusing outright to participate in substance abuse and mental health treatment that was recommended or offered to her, and of failing to comply with treatment once it actually was prescribed. This pattern persisted even when she was under a court order to obtain treatment as a condition of probation. During those brief, infrequent periods when plaintiff was compliant with her treatment regimen (such as during inpatient treatment), her GAF scores improved significantly. [See AR 110-115, 198-231, 273, 282-283, 297, 331-335, 338-341, 349-350, 447, 458-459, 489-498].

Third, a GAF score is distinguishable from a medical opinion, as that term is defined by the Commissioner, regarding a claimant's ability to engage in "substantial gainful activity" because of a

1  "medically determinable physical or mental impairment" that "has lasted or can be expected to last for a
2  continuous period of not less that 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. §§ 404.1527(a)(2),
3  416.927(a)(2)(defining medical opinions as statements from "acceptable medical sources that reflect
4  judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and
5  prognosis, what you can still do despite impairment(s), and your physical and mental restrictions."). The
6  GAF score "involves picking a single value that best reflects the individual's overall level" of psychological,
7  social, and occupational functioning. DSM-IV at 32. Thus, by definition the GAF score is a broader, more
8  amorphous, "catch-all" measure than a medical opinion as that term is used in the Commissioner's
9  regulations. Under the GAF's dual rating protocol, moreover, a low GAF score may reflect severe
10 symptoms that may, but do not necessarily, translate into work-related functional impairments, or the GAF
11 score may denote a significant impairment in social or psychological functioning that does not have a
12 correspondingly restrictive effect on occupational functioning. For example, as the DSM-IV explains,

> the GAF rating for an individual who is a significant danger to self but is otherwise
> functioning well would be below 20. Similarly, the GAF rating for an individual with
> minimal psychological symptomatology but significant impairment in functioning (e.g., an
> individual whose excessive preoccupation with substance use has resulted in loss of job and
> friends but no other psychopathology) would be 40 or lower.

18 DSM-IV at 32.

19 Fourth, the Commissioner explicitly has disclaimed an intent to endorse use of the GAF scale in the
20 social security disability determination and has stated that the GAF scale "does not have a direct correlation
21 to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating
22 Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (August 21, 2000).[2] "[A] GAF

---

[2] Responding in the Federal Register to comments regarding proposed rule changes, the Commissioner said:

> Comment: Two commenters recommended that we discuss the Global Assessment
> of Functioning ( GAF ) Scale in the introductory paragraphs of final 12.00D. They
> noted that we referred to the GAF scale in the preamble to the NPRM (56 FR at
> 33132) and seemed to encourage its use, but then failed to mention it in the proposed
> rules.

score may be of considerable help to the ALJ in formulating the RFC," however, "it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Howard v. Comm'r of Social Sec., 276 F.3d 235, 241 (6th Cir. 2002).

For all of these reasons, the ALJ's evaluation of plaintiff's GAF scores was not legally or factually defective.

**Information from "other sources"**

Plaintiff also contends that the ALJ erred in failing to discuss a narrative report from Sue Scott, plaintiff's benefits case manager at Riverside County Department of Mental Health. [JS 4-5]. The report states that plaintiff was prescribed Lamictal for a diagnosis of bipolar I disorder. Ms. Scott indicated that plaintiff exhibited mildly impaired judgment and severely impaired memory, problems concentrating, anxiety, depression, manic syndrome, suicidal ideation, inappropriate affect, inappropriate social interactions, rapid mood changes, and could not complete a 40 hour work week without decompensating. [AR 104].

Ms. Scott is not an "acceptable medical source" as that term is defined by the Commissioner, and it is not clear from the record what qualifications she possessed enabling her to assess plaintiff's mental status and abilities. See 20 C.F.R. §§ 416.913(a) and 404.1513(a)(stating that information from "acceptable medical sources," defined as licensed physicians, licensed or certified psychologists, license optometrists, licensed podiatrists, and qualified speech-language pathologists, is required to establish a medically determinable impairment).The ALJ "may also use evidence from other sources to show the severity of" a

---

Response: We did not adopt the comment. We did not mention the GAF scale to endorse its use in the Social Security and SSI disability programs, but to indicate why the third sentence of the second paragraph of proposed 12.00D stated that an individual's medical source "normally can provide valuable additional functional information." To assess current treatment needs and provide a prognosis, medical sources routinely observe and make judgments about an individual's functional abilities and limitations. The GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings.

65 Fed. Reg. 50746 at 50764 -50765.

claimant's impairments, 20 C.F.R. §§ 404.1513(d), 416.913(d), but the standards for rejecting treating and examining physicians' opinions generally do not apply to information from other sources. See Gomez v. Chater, 74 F.3d 967, 971-972 (9th Cir.), cert. denied, 519 U.S. 881 (1996); 20 C.F.R. §§ 404.1513(d), 416.913(d), 404.1527(d)(2), § 416.927(d)(2).

There is an exception to the Gomez rule. Where an "other source" consults frequently with, and works "closely under the supervision"of, an acceptable medical source, the "other source" may be considered to be "acting as an agent" of the acceptable medical source. Gomez, 74 F.3d at 971-972. Ms. Scott's report, however, does not indicate that she consulted frequently with, or worked closely under the supervision of, an acceptable medical source. Therefore, the ALJ was not required to articulate specific reasons for rejecting her assessment. Furthermore, based on the evidence from physicians who were acceptable medical sources, the ALJ made some of the same findings made by Ms. Scott. For example, he found that plaintiff had severe depression, paranoia, bulimia, and agoraphobia, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [AR 13]. For these reasons, there is no merit to plaintiff's argument that the ALJ improperly evaluated Ms. Scott's report.

**Dr. Rosen**

Plaintiff contends that the ALJ erroneously "ignored" the opinion of Dr. Rosen, a state agency non-examining physician. [JS 10-11].

Dr. Rosen completed an RFC assessment form indicating that plaintiff was "not significantly limited" in most work-related mental functional abilities and was "moderately limited" in the ability to understand, remember, and carry out detailed instructions, and interact appropriately with the general public. [AR 417-421]. Dr. Rosen also completed a psychiatric review technique form ("PRTF") finding, with respect to the "B" criteria of the mental disorder listings, that plaintiff had a mild restriction in the activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace, and no extended episodes of decompensation. [AR 433].

The ALJ did not comment on Dr. Rosen's PRTF or RFC assessment form. However, the ALJ made precisely the same psychiatric review technique findings as Dr. Rosen with respect to the "B" criteria of the

mental disorders listings. [AR 13, 433].[3] Furthermore, the ALJ's finding that plaintiff retains the RFC for simple, repetitive tasks with no intense social interaction and no supervision of others is consistent with Dr. Rosen's RFC assessment. The ALJ based his RFC finding on the testimony of Dr. Perotti, who, like Dr. Rosen, was a non-examining physician. Unlike Dr. Rosen, however, Dr. Perotti had the opportunity to review the entire record, whereas Dr. Rosen's March 2005 opinion predates some of the treatment reports in the record. Thus, the ALJ did not reject Dr. Rosen's opinion and did not err in failing to articulate specific reasons justifying his evaluation of that nonexamining physician's opinion. See generally Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

**Vocational expert testimony**

Plaintiff contends that the ALJ posed an incomplete hypothetical question to the vocational expert during the hearing because the ALJ omitted the limitations Dr. Rosen indicated on the PRTF and in his RFC assessment. [JS 12].

The ALJ's job at the fifth step in the sequential evaluation procedure is to pose hypothetical questions that set out all of the claimant's impairments for the consideration of the vocational expert, who then "translates these factual scenarios into realistic job market probabilities ...." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). Hypothetical questions posed to the vocational expert must accurately describe all of the limitations and restrictions of the claimant that are supported by substantial evidence in the record.

---

[3] The psychiatric review technique is used to evaluate the severity of mental impairments in "broad functional areas" identified in the regulations. 20 C.F.R. §§ 404.1520a, 416.920a; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4. The psychiatric review technique

> requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments.

SSR 96-8p, 1996 WL 374184, at *4. Thus, the RFC assessment should be consistent with the psychiatric review technique findings but does not directly incorporate those findings.

1 Robbins, 466 F.3d at 886; Tackett, 180 F.3d at 1101.  A vocational expert's response to a hypothetical
2 question constitutes substantial evidence only if it is supported by the medical evidence. Embrey v. Bowen,
3 849 F.2d 418, 422 (9th Cir. 1988).  The ALJ's failure to include properly supported limitations in a
4 hypothetical question on which the vocational expert's testimony is based is not harmless error if a "proper
5 hypothetical would have included limitations which, the record suggests, would have been determinative
6 as to the vocational expert's recommendation to the ALJ." Robbins, 466 F.3d at 886.

7 The ALJ posed a hypothetical question to the vocational expert asking her to assume that the
8 hypothetical claimant was capable "of only simple, repetitive tasks, no intense . . . social interaction, and
9 no supervision of others." [AR 541].  That hypothetical question accurately reflects plaintiff's RFC as
10 ultimately found by the ALJ.

11 For the reasons explained above, the ALJ did not err in evaluating the limitations assessed by Dr.
12 Rosen on the PRTF and RFC assessment, and the ALJ's RFC finding is consistent with Dr. Rosen's RFC
13 assessment. The ALJ's hypothetical question accurately depicted plaintiff's RFC as found by the ALJ, and
14 therefore the ALJ did not err in relying on the vocational expert's testimony that plaintiff's RFC does not
15 preclude her from performing alternative jobs that exist in substantial numbers in the national economy.

16 **Jobs identified by the ALJ**

17 Plaintiff contends that the ALJ improperly excluded from her RFC the limitations posited by Dr.
18 Rosen, and therefore that she lacks the RFC to perform the alternative jobs identified by the ALJ. [JS 15-
19 18].

20 For the reasons already described, the ALJ did not err with respect to his evaluation of Dr. Rosen's
21 findings and conclusions, which were consistent with the ALJ's RFC finding.   Based on the vocational
22 expert's testimony, the ALJ found that plaintiff's RFC for simple, repetitive work with no intense social
23 interaction and no supervision of others did not preclude her from performing the alternative jobs of
24 Hospital Parts Assembler, Dictionary of Occupational Titles ("DOT") job number 712.687-010, and Sales
25 Attendant, DOT job number 299.677-010.

26 The DOT classifies the job of Hospital Parts Assembler as having a Specific Vocational Preparation
27 ("SVP") at Level 2, meaning that it can be learned by a "short demonstration up to and including 1 month,"
28 corresponding to the Commissioner's definition of unskilled work. DOT, Appendix C, Components of the

Definition Trailer (4th ed. rev.1991); see SSR 83-10, WL 31251, at *7; Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990).  The DOT also defines the job of Hospital Parts Assembler as requiring Reasoning Development at Level 2, meaning that it requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DOT, Appendix C, Components of the Definition Trailer (4th ed. rev.1991). "Uninvolved" means "not intricate or complex."  The Random House College Dictionary, Revised Edition 704 (1980).   An RFC for simple, repetitive work does not preclude performing DOT jobs with a Level 2 SVP and a Level 2 Reasoning Development.  See Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that a limitation to "simple and routine work" was consistent with  Level 2 Reasoning Development); Meissl v. Barnhart, 403 F.Supp.2d 981, 982-984 (C.D. Cal. 2005)(holding that a claimant who was limited to "simple tasks performed at a routine or repetitive pace" was not precluded from performing an unskilled past job defined by the DOT as requiring Level 2 Reasoning Development).

  Plaintiff also contends that the DOT job of Hospital Parts Assembler exceeds her RFC because it requires the ability to take instructions and help people.  That is incorrect. The fourth, fifth, and sixth digits of a DOT job number comprise the "Worker Functions code" and refer to the worker's function in relation to data, people, and things, respectively.  DOT, Appendix B, Explanation of Data, People, and Things (4th ed. 1991). The number "8" in the fifth digit of the DOT job number refers generically to the people-oriented function of "Taking Instructions-Helping: Attending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to 'non-learning' helpers." DOT, Appendix B, Explanation of Data, People, and Things (4th ed. 1991).  However, the specific job information in the DOT definition of Hospital Parts Assembler, job number 712.687-010, specifies that the degree of "Taking Instructions-Helping" involved in that particular job is "Not significant."

  Plaintiff's RFC as defined by the ALJ does not preclude performance of the DOT job of Hospital Parts Assembler. The vocational expert testified that more than 19,000 such jobs exist locally and more than 350,000 such jobs exist nationally. [AR 17, 541]. The ALJ's finding that plaintiff can perform alternative work that exists in significant numbers in the national economy is supported by substantial evidence and is free of legal error.

///

### Conclusion

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and reflects application of the proper legal standards. Accordingly, the Commissioner's decision denying benefits is **affirmed.**

**IT IS SO ORDERED.**

DATED: April 15, 2008

/ s /

ANDREW J. WISTRICH
United States Magistrate Judge